The following constitutes
the order of the court. Signed June 9, 2016

_____
**M. Elaine Hammond**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA

In re

Sharlyn Bois,

            Debtor(s).

Case No. 14-50200 MEH

Chapter 13

---

Herbert K. H. Lee, III,

            Plaintiff.

v.

Sharlyn Bois,

            Defendant.

Adv. No. 14-5048

Date: April 11 and 12, 2016
Time: 9:00 a.m.
Ctrm: 3020 (San Jose)

## MEMORANDUM DECISION

A trial was held April 11 and 12, 2016 in the above-captioned adversary proceeding. Christian Molnar and Ashley Hunt appeared on behalf of Herbert Lee and Cathleen Moran appeared on behalf of Sharlyn Bois. Lee seeks a judgment deeming Bois' debt to Lee nondischargeable pursuant to Bankruptcy Code § 523(a)(2)(A).[1] He alleges that Bois made

---

[1] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

various misrepresentations regarding water intrusion, mold and soil erosion in connection with a 2008 sale to Lee of her Santa Cruz home (the "Property"). For the reasons provided below, the court finds that Lee has not established that his claim against Bois should be exempted from discharge.

This court has jurisdiction over the adversary proceeding pursuant to 28 U.S.C. § 1334 and General Order No. 24 of the United States District Court for the Northern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

Background

**1. Bois' occupancy of the Property**

Bois and her former husband Tim Robertson ("Robertson") (together, the "Sellers") moved onto the Property in August 1997. They immediately began renovations to the kitchen. For approximately ten months during the kitchen renovations, the Sellers and their two young sons lived in a separate unit in the basement of the Property. During that time, Bois testified that the family experienced no water intrusion in the basement. Once the family moved upstairs, they began the process of transforming the basement from a separate unit into a common area for the kids. They tore up the old carpet, laid down new carpet and painted the cinderblock walls. Bois testified that she saw no water when they replaced the carpet and that the kids never complained of water leakage in the basement.

Sometime in 1997 the Sellers also dug a trench and installed a gas line that runs along the north wall of the back side of the Property (the "Gas Line Trench"). The Gas Line Trench would later be described as a "French drain" in the transaction with Lee. Bois testified that she paid the invoice for the installation of the Gas Line Trench, which invoice provides: "Installed underground gas line to laundry room. Trenching & backfilling by owner." Bois testified that she did not know who installed the "French drain," because she was not present. However, she claims she was informed by Robertson that he had paid cash to gravediggers from a nearby cemetery to dig and backfill the trench.

In early 2000, the Sellers began to make more substantial basement renovations. Among other improvements, they tore down a wall to open up the basement area, removed a stove, installed a fireplace, painted walls, and installed new counters and flooring. They also ran birch paneling along the north wall of the basement (the "North Interior Basement Wall").

With respect to the 2000 basement project, Bois testified as follows: Bruce Sugarman was the contractor who managed the project. During the majority of construction, Bois was busy taking care of the kids and Robertson was out of the country for work. Although he was out of the country, Robertson was Sugarman's primary point of contact during construction. When construction finished, Sugarman explained that he had carved out a channel into the floor behind the paneling (the "Channel") along the north wall of the basement in contemplation of a "worst case scenario" and to protect the newly-installed paneling, its birdseye maple trim, custom tiling on the fireplace and zebrawood on the mantle. Sugarman reported no water damage during construction.

The Channel led to a sump pump (the "Sump Pump"), which the Sellers installed underneath a cabinet. The Sump Pump was one of two on the Property; the second was in the backyard. Like the Channel, the Sump Pump was not visible to the eye. Unlike the Channel, which was obscured by the fixed paneling, the Sump Pump was accessible through an access panel in the floor of the cabinet.

In October 2004, Robertson moved out of the house and the Sellers separated. In February 2006, the driveway of the Property was graded, paved and moisture treated. Bois does not recall having that work done but the timing indicates that it was likely undertaken in connection with preparing the house for sale. In the first part of 2006, the Sellers listed the Property for sale and employed Tom Dexel as their listing agent. Dexel had previously worked with the Sellers in purchasing the Property.

Sometime that year, the Sellers opened escrow with a potential buyer. A termite inspection report produced in June 2006 in connection with that escrow identified calcium deposits on one of the walls of the garage. But Bois did not recall ever seeing the termite report and no evidence was introduced indicating that she had.

The Property was on the market for about 18 months before Lee viewed it. There was testimony indicating that the listing price decreased during this period. During the entire listing period, Bois was the sole adult living at the Property and responsible for household and parental responsibilities.

**2. The sale transaction**

In September 2008, Lee and the Sellers entered into a sale agreement. Entering into the transaction, Lee was particularly mindful of mold and moisture issues because his partner's immune disorder caused a heightened sensitivity to those issues. Lee's real estate agent, Diane Molnar, testified that she made that point clear to Dexel at various times prior to the close of escrow. Lee's partner testified that he too expressed his concerns to Dexel during the initial inspection, and to Bois during the final walk-through. Molnar testified that she observed the discussion between Lee's partner and Bois. Lee testified that he would not have purchased the Property had severe water intrusion issues been disclosed to him prior to close of escrow.

a. <u>Written disclosures</u>

On September 23, 2007, the Sellers signed a Real Estate Transfer Disclosure Statement in connection with the transaction (the "Disclosure Statement").[2] Section A of the Disclosure Statement is a checklist of items that the Sellers represented to be included with the home. The "Sump Pump" box is checked. Section B asks: "Are you (Seller) aware of any significant defects/malfunctions in any of the following?" The "Yes" box is checked, along with the "Walls/Fences" box. No other boxes are checked in Section B. In the "Describe" field to Section B, the Sellers disclosed the following: "Retaining wall of driveway was replaced February 2006." Section C asks: "Are you (Seller) aware of any of the following?" The "No"

---

[2] The Sellers' disclosures were prepared at least a year after the home was placed on the market. No explanation was provided for the time difference between initial listing and preparation of the Disclosure Statement and Supplemental Checklist.

boxes are checked for items 7 and 8, which provide: "7. Any settling from any cause, or slippage, sliding, or other soil problems" and "8. Flooding, drainage or grading problems."

Bois testified that she personally checked the boxes for the disclosures in the Disclosure Statement. In preparing the Disclosure Statement, she compared one set of documents with another set of documents completed by Robertson. Bois and Dexel then prepared the Disclosure Statement, relying on her responses where there were discrepancies.

On September 23, 2007, Bois also signed a PRDS Supplemental Seller's Checklist (the "Supplemental Checklist"). It provides a preliminary "Caution to Seller" warning sellers that "if you are in doubt as to whether a condition constitutes a defect, it is always prudent to disclose and explain rather than remain silent." In essence, if in doubt, disclose.

Likewise, it provides a "Caution to Buyer" to inspect and make additional inquiries about the Property. It also notes that these disclosures "reflect a seller's non-expert, subjective perceptions of the Property."

As with the Disclosure Statement, Bois prepared the disclosures in the Supplemental Checklist with Dexel, resolving any disputes in the information provided by Robertson by using her response. The form instructs the seller to answer yes if the seller is aware of any negative condition, whether past or present, or whether previously repaired. If an item is checked yes, then the seller should explain in detail on the lines at the end of the category. This is consistent with the testimony of Molnar, Lee's real estate broker, that her understanding is that for most items on the Supplemental Checklist a seller should provide further explanation where she checks "yes."

The boxes relevant to this discussion are checked as follows:

| Item | Yes/No | Explanation |
|---|---|---|
| 3(b) Are you aware of any soils problems, such as settlement, movement, cracking, slippage or instability? | No | Retaining wall at driveway was replaced February 2006

Cracks in driveway |
| 3(d) Are you aware of any settlement, movement, cracking, shifting, separation or sub-surface erosion as to walkways, patios, swimming pool or other decking, or any other pavement or hardscape? | Yes | |
| 5(a) To your knowledge, does there presently exist, or are you aware of any history of, any standing or ponding water or periodic persistent dampness or moisture, in any sub-areas or elsewhere on the Property? | No | (none) |
| 5(b) Are you aware of any past or present flooding (even minor water intrusion) into the garage, basement, or sub-areas? | No | |
| 5(c) To your knowledge, has any other part of the Property suffered any flooding or drainage problems? | No | |
| 5(d) To your knowledge, have any drainage systems (e.g., French drains, curtain drains), sump pumps, fans, or dry wells ever been installed on the property? | Yes | |

When Molnar received the disclosures, they were about a year old. On October 14, 2008, in response to a request from Molnar, the Sellers signed separate letters stating that to the best of their knowledge, nothing at the Property had changed since they signed the disclosures. Both letters appear to refer to the Disclosure Statement and the Supplemental Checklist. Lee and Molnar testified that the letters were provided to them about one day prior to close of escrow.

b. <u>Lee's general inspection</u>

Lee had the home inspected five times during the escrow period (a general inspection, a chimney inspection, a termite inspection, a roof inspection, and a septic inspection). The general inspection took place on September 26, 2008. Lee, his partner, Molnar, and Dexel were present. The Sellers were not. Larry Keefauver ("Keefauver") of Lawrence Real Estate Inspections inspected the Property.

During the inspection Keefauver noted "minor efflorescence" on a wall in the garage. According to Lee, that wall was largely obstructed by boxes. Lee did not move the boxes or ask that the boxes be moved. Molnar similarly testified that the bottom three-foot portion of the wall—the portion that showed signs of efflorescence—was not visible. Keefauver explained, according to Lee, that efflorescence is common in houses below grade and that a common solution to the problem is to install a French drain around the house to wick the water away from the house. According to Molnar, Keefauver suggested that Lee consult with the Sellers about the issue.

It is uncontested that the Channel was not visible and that the Sump Pump was located behind a door. Thus, neither Lee nor Keefauver saw them during the inspection.

Keefauver provided a Residential Building Analysis to Lee after the inspection (the "Inspection Report"). Relevant findings and recommendations coded as [R] (recommended review by specialist) and [N] (notice, discretion advised as significance of the problem is uncertain) are provided in the following chart along with actions taken by Lee in response:

| Page | Code | Finding | Follow-up |
|---|---|---|---|
| 5 | **[R]** | Drainage near building questionable. The rain gutter was not connected to the underground discharge on the right rear corner of the garage. This may indicate a clogged drain line or other problems that are not visible or accessible for this inspection. Water standing against the foundation or concrete slab may be leading to other problems. It is recommended that the finding be reviewed, and corrected as needed, by a qualified licensed contractor before purchasing the property. | Lee testified that he did not follow up on these recommendations because 17 days remained prior to closing. |
| 10 | **[R]** | Metal flashing faulty or otherwise amiss. Noted for the chimney chase at the roof level. It is recommended that the finding be reviewed, and corrected as needed, by a qualified licensed contractor before purchasing the property. | Lee testified that he did have the metal flashing reviewed by a contractor. He prioritized this issue because he viewed it as a health and safety issue. |
| 31 | **[R]** | Water intrusion evidence or water damage noted. Water damage was noted to the interior lower heater closet wall. Stained or water damaged ceilings or | According to Lee, this relates to water intrusion through the chimney. Lee |

| | | walls can be positive indicators of ongoing roof, plumbing, or other leaks. The inspector will not always be able to ascertain whether the water intrusion is ongoing or has been repaired. It is recommended that the finding be reviewed, and corrected as needed, by a qualified licensed contractor before purchasing the property. | did follow up on this; he replaced the flashing on the chimney cap after the sale closed, which resolved chimney water intrusion issues. |
|---|---|---|---|
| 40 | [N] | Foundation or slab efflorescence noted. Efflorescence is a white looking powder which forms on cement concrete surfaces, and almost all other masonry product surfaces if moisture is migrating through the material. The most usual offender is improper lot drainage. The moisture barrier condition at the rear and sides of the building for the foundation could not be inspected. Discretion advised. The significance of the finding is uncertain. Further study by a qualified licensed foundation contractor is advised. | Lee followed up on this by asking Dexel for additional information. Based on the information Dexel provided, Lee did not pursue further inspection. |

After Lee received the Inspection Report, he and Molnar called Dexel to discuss the efflorescence noted. Dexel responded, in some detail, that Robertson had hired gravediggers to dig the trench to install the French drain over ten years prior. He additionally indicated that there had not been any major water intrusion issues and that the French drain had fixed any water intrusion problems. Molnar corroborated this testimony. Both Molnar and Lee indicated that Dexel's tone was matter-of-fact and authoritative. Lee testified that he was satisfied with Molnar's explanation and had no further concerns about the efflorescence.

c. The walk-through

Lee, his partner, Spike Crutcher, Molnar, Dexel, Bois and her two sons were present at the final walk-through. This was the only time Lee and Bois spoke prior to close of escrow.

Lee, Crutcher, and Molnar each testified that the Sump Pump was not shown or disclosed during the walk-through.

On the other hand, Bois testified that she "wanted to make sure they know about the sump pump," that "it had never been used, but that it was there, in case of a worst-case scenario." According to Bois, she felt the need to do so because she understood that walk-

through was meant to illuminate "where things were and how things worked" and because the Sump Pump had not shown up on the Inspection Report. She also testified that during the walk-through, her son Michael reminded her to show the Sump Pump; Michael then moved a TV tray and opened the cabinet door, exposing the Sump Pump. Lee then got on his hands and knees to examine the Sump Pump. Bois also recalled either going upstairs and getting a flashlight for Lee, or sending Michael up to do so. Michael also testified that Lee was shown the Sump Pump, although his testimony differed slightly in that he recalled the Sump Pump being turned on during the inspection. Bois did not recall any other time prior to close of escrow that she was questioned about, or provided additional information on, the Sump Pump.

Molnar and Lee testified that Lee took notes during the walk-through. His notes were admitted as evidence and make no mention of the Sump Pump. Bois challenged the notes because she recalled spending a great deal of time explaining the first and second floor, which are glossed over in the notes.

After the walk-through, Molnar filled out a "Verification of Property Condition," signed off by Lee and the Sellers. She testified that this form is used to document any difference in the property condition since acceptance of the offer. It also provides space to fill in any exemptions to the repair requirements. "No exceptions" is written on the document in Molnar's handwriting. Molnar testified that had the Sump Pump been discovered she would have noted it on this form.

d. <u>Post-sale</u>

The sale closed in October 2008. After the first rain of the season, Lee discovered leaking water in the basement. According to Lee, water seeped in along the wall and pooled in the storage areas in the garage. Standing water accumulated along the garage door. However, the seal of the garage door was tight, which indicated that the water came from the far wall rather than the garage opening.

Lee contacted Molnar, who contacted Dexel. Dexel came out to the house and showed Lee the Sump Pump. Lee testified he was very surprised at this new information. Dexel also

informed Lee that he would contact the Sellers for more information. In response the Sellers provided Dexel with separate written responses regarding the French drain. Robertson's response stated that shortly after Sellers moved in a gas line was dug and then buried per specifications from the gas company. "That burial was very similar to a French drain and I never had any problems with water intrusion afterward." Robertson also recommended regularly checking the rain gutters.

Bois' response provided that it was recommended the gas line "trench be backfilled as a French drain. The French drain was installed as recommended." At trial, Bois stated that she used the term "French drain" parroting what her husband had told her.

Molnar contacted Dexel after receipt of the Sellers' responses. In their discussion, Dexel stated that what had been referred to as a French drain was actually a trench that had been backfilled with gravel after a gas line was installed. He also admitted to Molnar that this was different from the statements he made in the prior phone call with Molnar and her clients.

In response to the water intrusion, Lee obtained a number of estimates for repairs—several estimates for the structural drainage issues and several for the mold issues. Four of these estimates were admitted as evidence, and three construction professionals testified as to their observations in preparing a bid or estimate.

In April 2011, Lee filed an action for damages in connection with the transaction in the Santa Cruz County Superior Court. Lee then obtained a default judgment against Bois in the sum of $135,843.80, which represents sums paid to repair the Property, less settlement payments received before that date, plus attorney's fees incurred through that date.

Analysis

To prevail on a claim under § 523(a)(2)(A), the creditor must demonstrate five elements:

(1) that the debtor made representations;

(2) that she knew were false at the time;

(3) that she made them with the intent and purpose of deceiving the creditor;

(4) that the creditor relied on the representations; and

(5) that the creditor sustained damage as the proximate result. *Citibank v. Eashai (In re Eashai)*, 87 F.3d 1082, 1086 (9th Cir. 1996). The creditor bears the burden of establishing each element by a preponderance of the evidence. *Id.* at 1087 (citing *Grogan v. Garner*, 498 U.S. 279, 290 (1995)). Exceptions to discharge under § 523 are narrowly construed. *Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992).

**1. False Representations or Fraudulent Omissions**

The first element may be satisfied by an affirmative false statement or by omission. Silence may create a false impression constituting a misrepresentation for purposes of § 523(a)(2)(A). *See Cooke v. Howarter (In re Howarter)*, 114 B.R. 682, 684 n.2 (9th Cir. BAP 1990). In order for an omission to give rise to liability there must be a duty to disclose. *In re Eashai*, 87 F.3d at 1089. In order to determine whether a duty to disclose exists, the Ninth Circuit has looked to the Restatement of Torts. *Id.* This court does so as well. *Restatement (Second) of Torts* § 551 (1977) addresses liability for nondisclosure:

> (1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability as to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.
> (2) One party . . . is under a duty to exercise reasonable care to disclose to the other . . . (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading. ...

A debtor's knowledge and intent to deceive may be inferred by circumstantial evidence and from the debtor's conduct. *Edelson v. Comm'r of Internal Revenue*, 829 F.2d 828, 832 (9th Cir. 1987); *Donaldson v. Hayes (In re Hayes)*, 315 B.R. 579, 587 (Bankr. C.D. Cal. 2004). When determining the knowledge element, "[a] representation may be fraudulent, without knowledge of its falsity, if a person making it is conscious that he has merely a belief in its existence and recognizes that there is a chance, more or less great, that the fact may not be as it is represented." *In re Gertsch*, 237 B.R. 160, 168 (9th Cir. BAP 1999) (internal quotation omitted); *see also Houtman v. Mann (In re Houtman)*, 568 F.2d 651, 656 (9th Cir. 1978) ("Reckless indifference to the actual facts, without examining the available source of

knowledge which lay at hand, and with no reasonable ground to believe that it was in fact correct is sufficient to establish the knowledge element.").

Lee alleges he is entitled to relief based on either Bois' representations or omissions regarding the French drain, Sump Pump, water issues, mold, or soil issues.

(a) Sump Pump, Water Intrusion, and French Drain

Bois made representations about the Sump Pump, water intrusion, and French drain in the Supplemental Seller's Checklist. She represented that a drainage system (e.g. French drain, curtain drain), sump pump, fan or dry well had been installed at the property. No further information was provided. Bois also stated that she was not aware of any: (a) history of "standing or ponding water or periodic or persistent dampness or moisture, in any sub-areas or elsewhere on the Property"; or (b) "past or present flooding (even minor water intrusion) into the garage, basement or sub-areas."

(1) Sump Pump

Bois' position is that she correctly identified there was a sump pump on the property and showed it to Lee during the final walk-through, and that she never experienced any flooding or water intrusion while living at the Property. The court does not find credible Bois' recollection that she showed Lee the Sump Pump on the final walk-through. Bois testified that she showed Lee the Sump Pump then because this was the time to show the "nuts and bolts" of the house and because "in full disclosure, I wanted to make sure that he knew it was there because apparently it wasn't, it didn't show up in the home inspection." Everyone agrees that Bois was not present when the home inspection occurred. With that in mind the only way Bois could have known the Sump Pump was not disclosed was to have read the Inspection Report. The report is 57 pages long with small print and lots of minutiae. Bois' detailed review of the Inspection Report is not consistent with Bois' other testimony that she was primarily focused on the move during this period and not closely involved in the sale activities. Moreover, there are two written documents prepared contemporaneous with the walk-through that made no

mention of the Sump Pump. The first is the Verification of Property Condition. Molnar testified that this is a standard document that is completed after the final walk-through and used to note any changes in condition and the status of repairs or modifications agreed to be completed by the buyer. As completed, the report states "No Exceptions," indicating that the Property was as expected on the walk-through. It was signed by Lee on October 11, 2008 and by Bois two days later. The second document is Lee's handwritten notes from the walk-through. The notes include references to various issues throughout the house, including where the gas shut off is located, what light switches control different areas, and where the gray water system and related sump pump are located. Notably absent is any reference to the Sump Pump located within a cabinet. The court believes that in the nearly eight years since the walk-through occurred Bois has convinced herself that the events are as she testified. However, her recollection is not credible when compared to contemporaneous records of the time.

This turns the analysis to whether checking the box that the Property had a French drain, sump pump, or other drainage system was a sufficient disclosure. It is undisputed that Bois' Supplemental Disclosures identified a drainage system of some type on the Property. Here though, the Property had two sump pumps – one visible and exterior, the other hidden and interior – and, in addition, the Property had a backfilled trench that Bois understood to be a French drain. The form provides that "if 'yes' is checked on any of the above, please explain below." In 10 different sections of the Seller's Checklist, Bois provided additional information where a "yes" applied, including that a retaining wall was replaced in February 2006, that the roof was replaced in 2007, and that the pet on property was a beta fish. Clarification of the drainage systems on property, and the existence of an interior, hidden sump pump, appears equally (or more) important to prospective homeowners. No explanation is provided by Bois as to why additional information was not contained in this disclosure.

The court finds that since the Sump Pump was not visible without opening a corner cabinet, and that the property had two sump pumps and a French drain, Bois was under a duty to exercise reasonable care to disclose to potential buyers additional information regarding this

disclosure to prevent her partial or ambiguous statement from being misleading.[3] See Restatement (Second) of Torts § 551(2)(b). This she failed to do. Merely checking "yes" failed to put potential buyers on notice that they needed to conduct a detailed inquiry in order to determine whether one or more items were present on the Property. As such, Bois' limited disclosure of the Sump Pump constitutes a fraudulent omission.

### (2) Water Intrusion

Again Bois relies on her testimony and that of her son that they never experienced any flooding or water issues while living at the property. Lee's witnesses included three contractors who either provided a quote for services or performed work to address water damage on the Property. The first witness, Richard Wallbaum, testified that he had prepared a bid for repair work. In reviewing the property he found evidence of long term water intrusion that would have occurred over time as a result of the original waterproofing materials used in the house breaking down. He noted that the cinder block walls are not waterproof and require a waterproof membrane for protection. To him, there appeared to be evidence of a prior attempt to address this problem but the wrong type of material was used. The second witness, Robert Patterson, also prepared a bid for repair work. He was particularly concerned by the build-up of efflorescence, a white film or caking on the wall left as deposits on the wall after water that has moved through the wall evaporates. He found extensive visual evidence of efflorescence on the lower 2-3 feet of the wall into the interior of the garage. Yet Patterson also noted that the water leaking through the cement block would ooze through the microscopic pores rather than gush water and may not have been as visible in a garage with boxes stacked several feet high. The third witness, James Porter, ultimately performed repair work on the Property. He testified that based on different materials used, there appeared to be three to four times that

---

[3] In making this finding the court interprets § 551(1) to apply where the declarant fails to disclose a fact *that he knows may* induce the other party to refrain from a business transaction as requiring awareness of the possibility, rather than actual knowledge.

water-related repairs were attempted. Notably, none of the contractors were able to identify when repair attempts were undertaken during the almost 35 year life of the home.

No evidence is presented of insurance claims or repairs to the home due to water damage while Bois lived in the house.[4] During his inspection Keefauver identified efflorescence and explained what he was seeking to Lee and others. There is no evidence that Bois was similarly educated in the signs of water intrusion such that she would have known its cause. The only document indicating Bois' possible awareness of water issues during this period is a list of repairs and deferred maintenance needed to prepare the house for sale. This list was created by Bois and her real estate agent in January 2006. Included on the list is "Scrape and Dry-loc @ basement furnace room wall." Bois testified that this work was not done prior to placing the Property on the market. The inclusion of this item evidences a deferred maintenance issue in the basement but it does not necessarily follow that flooding or water intrusion was visible to Bois. Further, the "basement furnace room wall" is at the opposite end of the house from the garage area. As such, Lee has not established by a preponderance of evidence that Bois knew that the Property experienced flooding or water intrusion when she completed the Supplemental Disclosures and failed to disclose it.

### (3) French Drain

The French drain raises different issues. It became clear during trial that what constitutes a French drain depends on whom is talking. To the contractors, a French drain has a specific meaning and requires use of proper materials. Here, a trench was dug for a gas line in 1997 and refilled at the direction of Bois' former husband. There is no evidence that Bois was directly involved or knew that the work performed was not a proper French drain. Bois was told it was a French drain by her husband, she had no reason to believe otherwise, and thus, no knowledge that her disclosure of a French drain was incorrect. Thus, the court does not find

---

[4] The court finds evidence of work in early 2006 to replace a retaining wall near the driveway and driveway repair distinct from repairs to the structure or finishes of the house.

facts sufficient to infer that Bois knowingly misrepresented that there was a French drain on the Property.

(b) <u>Mold and mildew</u>

Lee also argues that Bois misrepresented mold and mildew issues at the Property. When Lee began remedial work on the home, mold and mildew were identified behind paneling and inside walls. No evidence was presented that mold and mildew were visible prior to opening the walls during construction. Hence there is no basis to find that this was a knowing misrepresentation.

(c) <u>Voids under the driveway</u>

The Supplemental Disclosures ask whether the seller is "aware of any soils problems, such as settlement, movement, cracking, slippage or instability." Bois answered this question "no." During Lee's construction work a portion of the driveway collapsed under the weight of a contractor's truck. Lee asserts that this is evidence of a misrepresentation by Bois as to the soil condition on the Property. Again, there is no evidence that voids under the driveway or other soil conditions were apparent until the driveway collapsed, and therefore, no basis to find a knowing misrepresentation.

**2. Intent to Deceive**

Intent to deceive is a question of fact. It may be inferred from surrounding circumstances. *Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1018 (9th Cir. 1997).

While Bois and the children continued to live in the home, Robertson stopped making the mortgage payments. The point in time when Bois learned of the payment default was not identified at trial. But Bois anticipated that the cash proceeds she would receive as part of her property settlement with Robertson would be from escrow following the sale of the house. It is reasonable to find that after the house had been on the market for over a year, Bois was concerned about diminishing equity in the home. Bois testified that she planned to use the sale

proceeds for her future support and her son's college tuition. In this situation, she was interested in obtaining a sale at the highest price possible – as are most sellers.

Lee asserts that Bois' intent to deceive is evidenced by the fact that boxes were stacked along the garage wall during the inspection, thereby obfuscating the extent of the efflorescence. But Lee testified that the boxes were stacked against a wall so that a car could be parked in the garage. Lee's agent, Molnar, described the boxes as a house getting ready to move. Thus, the court finds that boxes stacked along the wall of a garage when a home sale is imminent are insufficient to establish intent.

The Supplemental Disclosures were made after the Property had been marketed for a year and a half. In them, Bois identified the Property as having a drainage system, and possibly a sump pump. In 11 categories Bois provided additional information. Most of the additional disclosures provide positive additional information (i.e., retaining wall replaced in 2006, roof replaced in 2007). Only three additional disclosures contained information with a negative connotation (i.e., "settling cracks in sheetrock," "can hear Graham Hill traffic when outside"). It appears that additional information was provided to make the Property appear more attractive rather than to identify and clarify potential issues for a buyer.

These facts may equally be interpreted to infer an intent to deceive potential buyers about the Property, or the less nefarious intent to increase the appeal of the Property. Nor is the presence of boxes stacked along a garage wall prior to a move dispositive. As such, Lee has not established intent by a preponderance of the evidence.

### 3. Justifiable Reliance

Whether reliance is justified depends upon the "qualities and characteristics of a particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Field v. Mans*, 516 U.S. 59, 71 (1995).

Lee relied upon numerous representations in deciding to buy the home. They include the Supplemental Disclosures, the walk-through inspection conducted on September 26, 2008, the Inspection Report, and the representations made by Dexel, Bois' agent, regarding the French

drain.  The Supplemental Disclosures were the first received.  Then, Lee and his real estate agent accompanied Keefauver on the inspection.  During the inspection, Keefauver noted signs of efflorescence but could not tell the severity since it was in the dry season.  During the inspection Keefauver recommended that Lee obtain additional information from the Sellers and indicated that a French drain would be the standard method of moving water away from the house.  The Inspection Report also noted the efflorescence and recommended review by a qualified licensed contractor.

After receipt of the Inspection Report, Lee and his real estate agent called Bois' agent Dexel to ask about water issues on the property.  Dexel informed the parties that a French drain was installed on the property many years before and there had been no water issues since then.  It is not disputed that Dexel's statements were incorrect and that he did not have any contact with Bois about this issue before making them.  As such, Dexel's statements are not misrepresentations addressed in the analysis of Bois' liability and cannot be the basis for a finding of nondischargeability on her part.  *See Sachan v. Huh (In re Huh)*, 506 B.R. 257, 266 (9th Cir. BAP 2013) (adopting "knew or should have known" standard for the fraud of an agent to be imputed to a debtor for purposes of § 523(a)(2)(A)).

To exempt the debt from discharge, Lee must establish that he justifiably relied upon Bois' failure to fully disclose the Sump Pump in deciding whether to purchase the Property.  Or stated alternatively, if additional information regarding the Sump Pump had been identified on the Supplemental Disclosures Lee would have declined to buy the house.  Lee's argument is that due to his partner's compromised immune system he was very concerned about health and safety issues related to the house.  The court finds credible Lee's testimony that had he been aware of water intrusion or flooding, each of which lead to mold and mildew problems, he would not have purchased the Property.  But the only fraudulent omission is the Sump Pump, a water drainage system.  Lee knew the Property had a different water drainage system, the French drain, and chose to complete the Purchase.  The testimony is insufficient to establish that if Lee had known only about the Sump Pump, he would not have completed the sale.  Thus, Lee has not established justifiable reliance on the omission by a preponderance of the evidence.

**4. Damages**

The parties agreed that damages are set by the default judgment previously entered in state court in the amount of $135,843.80, subject to reduction for payments received from Robertson.

Conclusion

Following application of the evidence presented to § 523(a)(2)(A), the court finds that Lee has not established that his claim against Bois should be exempt from discharge. As such, judgment shall be entered in favor of Bois. Bois shall provide an appropriate form of judgment consistent with this Decision.

***END OF MEMORANDUM DECISION***

**COURT SERVICE LIST**

All ECF Recipients